**William Eugene THOMPSON, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**Nos. 1998–SC–0277–MR, 2001–SC–0869–MR.**

Supreme Court of Kentucky.

Aug. 26, 2004.

Rehearing Denied Nov. 18, 2004.

---

**7.** *Woodson,* at 340–42, 407 S.E.2d 222.

**8.** *Supra.*

Oleh R. Tustaniwsky, Susan Jackson Balliet, Assistant Public Advocates, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Connie Vance Malone, David A. Smith, Michael G. Wilson, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellant, William Eugene Thompson, appeals from a sentence of death imposed by the Lyon Circuit Court. Appellant was convicted of murder, robbery in the first degree, and escape in the first degree. Appellant was originally tried before a jury in Lyon County, and was found guilty and sentenced to death, twenty years, and ten years, respectively. On direct appeal, this Court reversed that conviction and remanded, determining that the trial court had refused to grant five valid strikes for cause and erroneously used a prior murder conviction still pending on appeal as an aggravator.[1]

Upon remand, Appellant pled guilty to all three charges. A second penalty phase trial was conducted, at which Appellant was again sentenced to death. Appellant waived jury sentencing of the non-capital offenses, and was sentenced to two consecutive terms of imprisonment totaling twenty years. The appeal in Case No. 1998–SC–0277–MR stems from the trial court's ruling that Appellant was competent to enter a guilty plea. The appeal in Case No. 2001–SC–0869–MR stems from the trial court's acceptance of Appellant's guilty plea, and the trial court's acceptance of the sentencing jury's recommendation of death.

---

1. *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871 (1993).

At the time of this crime, Appellant was serving a life sentence for murder. He was transferred to the Western Kentucky Farm Center, a minimum security prison facility that includes an inmate-operated dairy farm. During the early morning hours of May 9, 1986, Appellant and his supervisor, Fred Cash, reported to work at the dairy barn. According to Appellant, he became enraged outside a calf barn while he and Mr. Cash were attempting to start some equipment. Appellant admits striking Mr. Cash once to the head with a hammer. Little is known about exactly what transpired thereafter, as Appellant claims to have "blacked out." However, the evidence reveals that Mr. Cash's skull was crushed by numerous blows to the head with a hammer and his body was dragged into a calf's stall. According to Appellant, upon realizing what he had done, he removed Mr. Cash's pocketknife, keys and wallet, and left the Farm Center in the prison dairy truck. Appellant fled to the nearby town of Princeton, where he purchased a ticket and boarded a bus bound for Madisonville. The authorities apprehended Appellant in Madisonville.

■ Appellant appeals as a matter of right, presenting twenty-nine claims of error. For convenience sake, we have grouped Appellant's claims into various categories. Many of Appellant's cited errors are unpreserved. Nonetheless, in light of the penalty imposed in this matter and pursuant to KRS 532.075(2), we will consider even unpreserved issues. The standard of review of unpreserved errors in a case in which the death penalty has been imposed is as follows:

Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.[2]

### Competency Hearing

■ After hearing oral argument on Appellant's original appeal, we held that the trial court failed to hold the competency hearing required by KRS 504.100(3) before accepting Appellant's guilty plea.[3] Instead of reversing Appellant's conviction, we remanded the case to the trial court to determine whether a retrospective competency hearing was possible and, if possible, to hold the hearing.[4] On remand, the trial court concluded that it was possible to hold a meaningful retrospective competency hearing. At the conclusion of the hearing, the trial court found that Appellant was competent to enter a guilty plea. As provided for in our order, Appellant now appeals the trial court's ruling, which has been consolidated with his appeal from his guilty plea and sentence.[5] We first address the trial court's finding that holding a retrospective competency hearing would not violate Appellant's due process rights.

In our opinion and order remanding the case for a retrospective competency hearing, we provided significant guidance to

**2.** *Johnson v. Commonwealth*, Ky., 103 S.W.3d 687, 691 (2003), *citing Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668 (1991).

**3.** *Thompson v. Commonwealth*, Ky., 56 S.W.3d 406 (2001).

**4.** *Id.* at 410.

**5.** *Id.*

the trial court. "The test to be applied in determining whether a retrospective competency hearing is permissible is whether the quantity and quality of available evidence is adequate to arrive at an assessment that could be labeled as more than mere speculation."[6] Further, we stated that

> [a] retrospective competency hearing, may satisfy the requirements of due process provided it is based on evidence related to observations made or knowledge possessed at the time of trial. Other factors bearing on the constitutional permissibility of a retrospective hearing include: (1) the length of time between the retrospective hearing and the trial; (2) the availability of transcript or video record of the relevant proceedings; (3) the existence of mental examinations conducted close in time to the trial date; and (4) the availability of the recollections of non-experts—including counsel and the trial judge—who had the ability to observe and interact with the defendant during trial.[7]

Based on the quantity and quality of the evidence available, the trial court concluded that a meaningful retrospective competency hearing could be held. This evidence included the written transcript of the January 12, 1995 hearing in which Appellant withdrew his plea of not guilty and entered an unconditional guilty plea. The record also contains the competency evaluation report by Dr. Candace Walker, who was the psychiatric expert from the Kentucky Correctional Psychiatric Center (KCPC) who examined Appellant prior to the January 12 hearing. Additionally, the trial judge, who was the same judge who accepted Appellant's guilty plea, had available his own recollections of the hearing and his own observations of Appellant's behavior as well as that of trial counsel. Finally, the record contains defense counsels' assertions that Appellant was competent to plead guilty.[8]

We agree with the trial court's conclusion that there was sufficient evidence available to conduct a meaningful competency hearing on remand.[9] We now turn to the retrospective hearing itself.

 To be competent to plead guilty, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him."[10] Competency determinations are made based on a preponderance of the evidence standard.[11] A review of the evidence introduced at the retrospective competency hearing shows that

---

6. *Thompson*, 56 S.W.3d at 409 (internal quotation marks omitted).

7. *Id.* (internal quotation marks and citations omitted).

8. *See Lopez v. Walker*, 239 F.Supp.2d 368, 374 (S.D.N.Y.2003). (Defense counsel's representations as to defendant's competency or incompetency are particularly important.)

9. *See Reynolds v. Norris*, 86 F.3d 796, 803 (8th Cir.1996) (holding that a meaningful hearing could be held based on similar evidence in the record and other evidence available to be heard at the hearing).

10. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960).

11. *See Mozee v. Commonwealth*, Ky., 769 S.W.2d 757, 758 (1989) (strongly implying that this is the standard); *accord Allen v. Mullin*, 368 F.3d 1220, 1239 (10th Cir.2004); *United States v. Morrison*, 153 F.3d 34, 46 (2nd Cir.1998); *see also Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498, 506 (1996). ("A State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence.")

there was substantial evidence to support the trial court's ruling that Appellant was competent to plead guilty on January 12, 1995.

The trial court reviewed Dr. Walker's competency evaluation report. The report was completed and transmitted to defense counsel and the trial court a few days before the January 12 hearing. The report concluded that Appellant was competent to plead guilty. During the retrospective hearing, the trial court—relying on the record from the January 12 hearing—noted that defense counsel had agreed with the report's conclusion and had affirmatively stated that competency was no longer an issue for the defense. The trial court reviewed the *Boykin* colloquy it held with Appellant before accepting his guilty plea. The trial court heard the testimony of the Commonwealth's Attorney who prosecuted the case against Appellant. (Defense counsel was absent. From the record, it does not appear that either defense counsel was subpoenaed to testify at the retrospective hearing.) And finally, the trial court reviewed the deposition of Dr. Walker made in preparation for the retrospective hearing and introduced into evidence. In the deposition, Dr. Walker was extensively questioned by the Commonwealth and cross-examined by the defense. Little of this evidence places Appellant's competency in doubt and most of it supports the trial court's ultimate ruling that Appellant was competent to plead guilty. Thus, we conclude that the trial court's ruling was supported by substantial evidence and, therefore, was not clearly erroneous.[12] Finally, we note that competency claims raised on appeal may be based on violations of both procedural and substantive due process.[13] "A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent."[14] "Claims involving these principles raise similar but distinct issues: the issue in a substantive competency claim is whether the defendant was in fact competent to stand trial, but the issue in a procedural competency claim is whether the trial court should have conducted a competency hearing."[15] Thus, the underlying trial court error, which was a failure to hold the competency hearing required by KRS 504.100 or a hearing that was adequate to protect Appellant's due process rights, concerned a violation of *procedural* due process.

The purpose of the competency hearing—the procedural due process right—is to ensure that the substantive due process violation does not occur, *i.e.*, the Commonwealth does not try an incompetent criminal defendant.[16] We therefore conclude our discussion of the competency issue with an examination of the procedural safeguards required by statute at competency hearings, and whether these were provided at Appellant's retrospective hearing.

KRS 504.080 sets forth the procedural requirements for a competency hearing when a hearing is required by KRS

12. *United States v. Branham*, 97 F.3d 835, 855 (6th Cir.1996) (competency determinations are findings of fact).

13. *Vogt v. United States*, 88 F.3d 587, 590 (8th Cir.1996), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992).

14. *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir.2001).

15. *Id.* at 590–91.

16. *Vogt*, 88 F.3d at 590.

504.100.[17] One of the statute's requirements is that the examining psychiatrist must be present at the hearing unless the doctor's presence is waived by the defendant.[18] Additionally, the hearing must be "an *evidentiary* hearing with the right to examine the witnesses." [19] Finally, the statute implies a right to call independent experts retained by the defendant who "participated in" the competency evaluation.[20] These rights and requirements likewise apply to any retrospective competency hearing.

The retrospective hearing was clearly an evidentiary hearing in which Appellant was present. Defense counsel had the opportunity to both call and cross-examine witnesses. While Dr. Walker did not appear at the hearing itself, she was deposed and defense counsel had ample opportunity to cross-examine her conclusions and question her methods. Her deposition was introduced at the retrospective hearing. Thus, the procedural safeguards required by statute were afforded at the retrospective hearing. Because these safeguards are equal to or go beyond what is required by the United States and Kentucky Constitutions, we conclude that the retrospective hearing provided adequate procedural safeguards to determine the issue of Appellant's competency to plead guilty.[21] On appeal, Appellant argues that he was denied procedural due process at the retrospective hearing because the trial court denied his motion for funds for an independent expert to examine Appellant. This expert, who was retained to examine Appellant prior to entering his guilty plea, never examined or observed Appellant because Appellant refused to meet with him. Thus, the expert never "participated in" the competency evaluation of Appellant prior to the January 12 hearing and no argument can be made that the expert's presence was required by KRS 504.080. The trial court denied the funds on grounds that the expert's testimony would not be relevant because a current examination would have little bearing on the question of Appellant's mental state seven years before. The trial court did not abuse its discretion in denying Appellant's motion for expert funds on these grounds.[22]

For the reasons stated above, we affirm the trial court's ruling on remand that Appellant was competent to enter an unconditional guilty plea on January 12, 1995.

**Evidentiary Issues**

*Refusal to Allow Jury to Rehear Testimony*

About three hours into deliberations, the jury foreman requested that the jury be permitted to rehear Appellant's testimony. The trial court responded that the transcript had not yet been prepared by the court reporter, and that the jury would have to rely on its own recollections in deliberations. No objections were entered to the trial court's decision. Appellant now argues that the trial court's denial of the jury's request constitutes reversible error. According to Appellant,

17. *Gabbard v. Commonwealth*, Ky., 887 S.W.2d 547, 551 (1994).

18. KRS 504.080(3).

19. *Id.* (emphasis in original).

20. *See* KRS 504.080(5).

21. *See Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353, 368 (1992).

22. *Dillingham v. Commonwealth*, Ky., 995 S.W.2d 377, 381 (1999), *cert. denied,* 528 U.S. 1166, 120 S.Ct. 1186, 145 L.Ed.2d 1092 (2000). (A trial court's denial of funds for the assistance of experts is reviewed for abuse of discretion.)

the jury's request indicated possible confusion or misunderstanding, and that he was prejudiced when the jury eventually rendered its decision without the benefit of rehearing his testimony.

■ "Any decision to allow the jury to have testimony replayed during its deliberations is within the sound discretion of the trial judge."[23] We find no abuse of discretion in this case. The jury foreman made a plain request to the trial judge to rehear Appellant's testimony, and did not elaborate as to the reason for the request. The trial court was not presented with any indication that the jury was confused about Appellant's testimony, nor did the jury state or imply that a verdict could not be reached without a transcript or recording of the testimony. Moreover, the request was never reiterated. Having no reason to suspect that the jury was confused or unable to continue deliberations, we conclude that the trial court did not abuse its discretion in denying the jury's request to rehear Appellant's testimony.

*Admission of Crime Scene Photographs and Murder Weapon*

Appellant's next claim is that photographs of the crime scene and the actual murder weapon were improperly admitted into evidence. The admitted photographs depicted the crime scene, the bloodstained stall in which Mr. Cash's body was eventually found, and Mr. Cash's corpse. Appellant contends that the photographs and the bloody weapon were rendered irrelevant by his guilty plea, and that their gruesome nature served only to inflame and incite the jury to recommend death.

At the outset, the Commonwealth asserts that this issue is unpreserved for review. The record reflects that, at the time the photographs and weapon were admitted, defense counsel entered a renewed objection. Apparently, defense counsel was reiterating an objection that had been entered previously by Appellant's former counsel; however, the basis of the objection was not restated and the record does not include the actual pretrial motion. Nonetheless, it is clear from the transcript that the trial court was aware of and familiar with the basis of the objection, and that a pretrial motion objecting to the photographs had been denied.[24] Of course, the burden rests with Appellant to provide to this Court a complete and comprehensive record upon which to base appellate review. However, out of an abundance of caution and in light of the penalty imposed in this case, we will consider the admissibility of the photographs and weapon as if the issue had been properly and fully preserved at trial.

■ Appellant first argues that the photographs were so heinous and gruesome that any relevancy to the proceedings was outweighed by the possibility that the photographs would inflame and incite the jury to recommend death. The crime to which Appellant pled guilty is, by its nature, violent and gruesome. It necessarily follows that the evidence introduced by the prosecution to prove its case during the penalty phase will be disturbing, as well. However, Appellant does not contend that the photographs failed to portray the crime scene or the victim's body accu-

---

23. *Baze v. Commonwealth*, Ky., 965 S.W.2d 817, 825 (1997).

24. Upon defense counsel's renewed objection to the showing of the photographs to the jury, the trial court responded as follows: "Let the record show that prior to the trial in pretrial motions, objections to the showing of these photographs to the jury has (sic) been raised by the defense. That objection has been denied by the court."

rately.[25] An otherwise admissible photograph does not become inadmissible solely because it is gruesome and the crime is heinous.[26] Therefore, the trial court did not err in refusing to exclude the photographs simply because they were gruesome.

Appellant raises an alternative argument regarding the admissibility of the photographs and the murder weapon: Appellant challenges the relevancy of the exhibits in light of his guilty plea. The Commonwealth, however, has a right to prove its case to the jury with competent evidence even when the defendant pleads guilty.[27] In this case, Appellant stated that he did not remember anything past the first hammer blow to Mr. Cash's head. The photographs were presented to the jury in an effort by the Commonwealth to challenge Appellant's credibility by depicting the crime scene, the distance Appellant had to drag Mr. Cash's body to the stall, the number of wounds inflicted upon Mr. Cash, and to corroborate certain testimony of the prosecution's witnesses. The murder weapon was used to apprise the jury of the circumstances of the crime and to corroborate witness Dale Watson's testimony that the hammer was the weapon depicted in the photographs of the crime scene.

"An appellate court should reverse a trial court's ruling under KRE 403 only if there has been an abuse of discretion."[28] In making its determination, the trial court must weigh the probative value of the evidence against the risk of undue prejudice. Here, the photographs and the hammer were admitted to corroborate the testimony of several key witnesses. More importantly, the trial court correctly noted that a sufficient amount of evidence must be presented to the jury in a penalty phase proceeding where no trial has occurred, as the jury cannot be expected to make its determination without a comprehensive understanding of the serious nature of the charge. We conclude that the trial court based its decision on sound reasoning, and therefore no abuse of discretion occurred.

### Admission of Allegedly Prejudicial Evidence from Appellant's First Trial

Next, Appellant enters a general challenge to virtually all evidence admitted by the Commonwealth. Relying on *Old Chief v. United States*,[29] Appellant argues that all evidence of the crime beyond a recitation of the elements to which he confessed is inadmissible. In *Old Chief*, the U.S. Supreme Court concluded that, when a defendant has offered to stipulate to a prior conviction, evidence of the conviction is still relevant, though its relevance was outweighed by undue prejudice and therefore inadmissible under FRE 403. Appellant further argues that the guidelines set forth in *Boone v. Commonwealth*[30] require the trial court to prohibit any evidence of Appellant's crimes beyond the description of the crimes, including the elements, and the fact that Appellant had pled guilty to said crimes.

25. See *Johnson v. Commonwealth*, Ky., 103 S.W.3d 687, 696 (2003).

26. *Barnett v. Commonwealth*, Ky., 979 S.W.2d 98, 102 (1998). See also *Chumbler v. Commonwealth*, Ky., 905 S.W.2d 488, 496 (1995).

27. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 107 (1980), *cert. denied*, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981).

28. *Barnett*, 979 S.W.2d at 103.

29. 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

30. Ky., 821 S.W.2d 813, 814 (1992).

Appellant's reliance on both *Old Chief* and *Boone* is misplaced. Both cases involved situations in which a guilt phase trial was held, thus providing the court with a certain body of evidence from which to extract evidence for purposes of sentencing. Here, no guilt phase trial ever occurred, as Appellant pled guilty. While the types of admissible evidence delineated in *Boone* are guidelines for the trial court, we do not agree with Appellant that *Boone* should be read as a strict limitation on the types of evidence admissible in a penalty phase trial where the defendant has pled guilty. Nor does *Boone* itself purport to create such a strict limitation: the Court in *Boone* provided a list of what types of evidence "might be pertinent." [31] Here, because no guilt phase trial occurred, the types of admissible evidence set forth in *Boone* alone were insufficient in this case to adequately apprise the jury of the nature of Appellant's crimes. As noted in *Boone* itself, the sentencing jury cannot be expected to fix punishment "in a vacuum without any knowledge of the defendant's past criminal record or other matters that might be pertinent to consider in the assessment of an appropriate penalty." [32] With that principle in mind, the trial court must use its discretion in admitting relevant evidence that will sufficiently inform the jury of the crimes committed, while avoiding undue prejudice. Here, we conclude that the trial court violated neither *Boone* nor *Old Chief* in admitting evidence of Appellant's crimes. The evidence admitted—including the testimony of pathologist Roberta Conrad to which Appellant objects particularly—was relevant and reasonably calculated to inform the jury of the nature of the crimes and did not unduly prejudice Appellant. Accordingly, we find no error.

*Admission of So–Called Blood Spatter Evidence*

Appellant's final evidentiary claim involves so-called blood spatter evidence, the admission of which Appellant challenges with three distinct arguments. The Commonwealth sought to establish that blood spatters were found inside the calf stall in which Mr. Cash's body was found. The presence of blood spatters inside the stall would tend to support the Commonwealth's theory that Appellant beat Mr. Cash both inside and outside the calf stall. Defense counsel entered an objection to the admission of this evidence, and the trial court entertained extensive and lengthy arguments in chambers concerning the matter. The Commonwealth asserted that blood spatter evidence was relevant to undermine Appellant's credibility, as Appellant testified at his original trial that no assault occurred in the stall. The trial court ultimately prohibited any expert evidence concerning the possibility of an additional assault in the calf stall or the presence of blood spatters in the calf stall, on the grounds that it had not been admitted at the first trial. [33] The trial court did permit the Commonwealth to admit photographs of the crime scene, as well as the testimony of investigating officers as to what they observed in the calf stall, including the presence of fresh blood. However, the trial court sternly and unequivocally prohibited the Commonwealth from allowing the investigating officers to conclude that the presence of blood spatters in the calf stall indicated that a second assault occurred.

---

31. *Id.* at 814.

32. *Boone,* 821 S.W.2d at 814, *citing from Commonwealth v. Reneer,* Ky., 734 S.W.2d 794, 797 (1987).

33. *See* n.14, *infra.*

The testimony at the heart of Appellant's claims of error is that of Sheriff Ronald Murphy, who was the investigating officer and personally observed Mr. Cash's body in the calf stall. The trial court permitted Sheriff Murphy to testify that he found Mr. Cash's body in the stall and observed "bloody spots around the body and around the straw there and around the head." Sheriff Murphy further testified that he noticed a curry comb "laying right close to his head and it had blood spots all over it" and that the "straw around the upper part of his body had blood specks all over it." Finally, the Commonwealth asked Sheriff Murphy if the blood on the hay and on the curry comb appeared to be fresh blood, and the witness replied in the affirmative. Appellant now objects to the admission of this testimony on two grounds.

Appellant first challenges the admission of Sheriff Murphy's testimony on grounds that it was inadmissible because it was not introduced at his first trial. The trial court had ordered that the Commonwealth would not be permitted to introduce evidence that had not been introduced at the first trial.[34] Appellant argues that the admission of the testimony of Ronald Murphy, an investigating officer, violated this order. Without analyzing whether a violation of this order would even constitute reversible error, we conclude that this argument is without merit because the Commonwealth did not introduce any new evidence.

Ronald Murphy's testimony was limited to his own observations when he found Mr. Cash's body in the stall. After reviewing his testimony at both proceedings, we conclude that his testimony at the penalty phase proceedings did not substantively expand the testimony he gave at Appellant's first trial. Nor did Sheriff Murphy testify as to blood spatters in relation to the second assault theory as Appellant argues; rather, Sheriff Murphy merely stated that he observed fresh blood on the hay and the curry comb that were found inside the stall with Mr. Cash's body. Having determined that no new evidence was admitted, we find no error.

■ Appellant next argues that Sheriff Murphy's testimony constitutes expert testimony on blood spatters within the meaning of KRE 702, and therefore it was error for the trial court to admit such testimony without the benefit of a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[35] Further, Appellant argues that it was an abuse of discretion for the trial court to deny his motion for a continuance for the purpose of refuting Sheriff Murphy's expert testimony. We find both arguments to be without merit.

■ Upon review of Sheriff Murphy's testimony, we do not believe that he testified as an expert witness, and therefore KRE 702 and *Daubert* have no application. Sheriff Murphy testified as to his observations upon entering the stall: that he observed blood on the hay and the curry comb near Mr. Cash's body, and that in his opinion the blood was fresh. We simply do not agree with Appellant's characterization of Sheriff Murphy's testimony as expert testimony based on "scientific, technical, or other specialized knowledge" within the meaning of KRE 702. Murphy never testified regarding blood spatter patterns; in fact, the term "blood spatter" is not to

34. By order dated January 13, 1998, the trial court ruled: "... the Commonwealth has advised the Court and counsel for the Defendant that it does not intend to introduce any new evidence at the penalty phase other than the evidence presented at the original trial."

35. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

be found once in the entirety of his testimony. His testimony was limited to his own observations. It does not take an expert to identify blood around a dead body, nor to give an opinion as to whether blood appears fresh. Whether a witness is a qualified expert is a matter within the sound discretion of the trial court.[36] Here, as Sheriff Murphy's testimony was limited solely to his personal observations on the morning of the murder, we are not persuaded that the trial court in any way abused its discretion. Accordingly, no abuse of discretion occurred when the trial court denied Appellant's motion for a continuance.

*Admission of Statements and Items Seized from Appellant's Person*

■ Appellant next claims that the trial court erroneously permitted the Commonwealth to introduce statements he made to police at the time of his arrest and items seized from his person. This issue is unpreserved. Defense counsel filed no motions to suppress the statements made by Appellant after he was apprehended at the Madisonville bus station or to suppress the knife, bus ticket, and bloody shoes found on Appellant at the time of the arrest. Rather, Appellant now argues that the trial court should have conducted a suppression hearing on its own motion.

■ At the outset, it should be noted that the entry of a valid guilty plea effectively waives all defenses other than that the indictment charged no offense.[37] Further, a guilty plea constitutes a break

in the chain of events, and the defendant therefore may not raise independent claims related to the deprivation of constitutional rights occurring before entry of the guilty plea.[38] Where a defendant has entered an unconditional plea of guilty, he may not later challenge allegedly improper lineup identifications or the police's failure to provide *Miranda* warnings.[39] Accordingly, Appellant now is unable to challenge the constitutionality of his arrest and the admission of certain pieces of evidence due to his unconditional plea of guilty.

Interestingly, Appellant essentially concedes this conclusion. Rather, according to Appellant, the principle set forth in *Quarles* and its progeny—that a valid guilty plea waives all defenses other than that no offense has been charged by the indictment—does not apply in situations where only the sentence, not the validity of the guilty plea, is being challenged. Appellant insists that *Sanders v. Commonwealth*[40] is inapplicable to this issue, as the Commonwealth proposes, because the suppression issue there related only to the defendant's guilt. Furthermore, Appellant notes that the court in *Sanders* specifically stated that a valid guilty plea does not waive a right to appeal the sentence.[41] Here, Appellant argues that a suppression hearing should have been conducted to limit the evidence introduced during the penalty phase, and such a challenge is not waived by entry of a valid and unconditional guilty plea.

■ Unfortunately, we cannot reach the merits of this novel issue be-

**36.** *Cormney v. Commonwealth*, Ky.App., 943 S.W.2d 629, 634 n. 2 (1997).

**37.** *Quarles v. Commonwealth*, Ky., 456 S.W.2d 693, 694 (1970).

**38.** *Centers v. Commonwealth*, Ky.App., 799 S.W.2d 51, 55 (1990), *citing White v. Sowders*, 644 F.2d 1177 (6th Cir.1980).

**39.** *Thomas v. Commonwealth*, Ky., 459 S.W.2d 72 (1970).

**40.** Ky.App., 663 S.W.2d 216 (1983).

**41.** *Id.* at 218.

cause no motion to suppress was ever presented to the trial court. Of course, in capital cases, we will review even unpreserved errors pursuant to *Sanders*.[42] However, such an analysis is necessarily predicated upon a determination that an error actually occurred. Here, no error occurred because the trial court has no duty to conduct a suppression hearing on its own motion. We find this argument similar to Appellant's assertion, *infra*, that the trial court should have, *sua sponte*, offered him an opportunity to withdraw his guilty plea. The trial court must ensure a fair trial; the trial court is not burdened by the duty to try the case on behalf of defense counsel. Even when an objection or motion has been made, the burden continues to rest with the movant to insist that the trial court render a ruling; otherwise, the objection is waived.[43] Hence, absent a defense motion to suppress, the trial court committed no error in admitting the evidence to which Appellant now objects.

### Arguments Relating to Appellant's Plea of Guilty

*Validity of Guilty Plea*

■ Appellant raises two issues surrounding his plea of guilty to capital murder, first-degree robbery, and first-degree escape. First, Appellant argues that his due process rights were violated when the trial court accepted his guilty plea because he failed to admit each element of both the murder and robbery charge. After a review of the record and considering the totality of the circumstances surrounding Appellant's guilty plea, we conclude that Appellant's guilty plea was made voluntarily and with understanding of the charges and, therefore, no due process violation occurred.

Appellant contends that he never admitted to one element required for the murder charge and one element required for the first-degree robbery charge, and therefore the trial court should not have accepted his guilty plea. The element of murder, as defined by KRS 507.020, which Appellant claims he did not admit is "to cause the death of another." Appellant denies admitting to the trial court that he administered the fatal blow to Cash. At his first trial, Appellant testified that he remembered striking Cash one time with the hammer, but does not remember any subsequent blows. Thus, according to Appellant, he never admitted that he dealt the fatal blow to Cash; Appellant also raises the possibility that another inmate could have administered subsequent blows to Cash.

Appellant makes a similar claim with respect to the first-degree robbery charge. He argues that he did not admit to all the elements of first-degree robbery: that crime requires the actor to be "in the course of committing a theft" and Appellant claims that he did not admit to being in the course of committing a theft when he removed money from Cash's wallet.[44] Appellant told the trial court that he did not form the intent to take anything from Cash until after Cash was unconscious. By virtue of this statement, Appellant opines, he was not in the course of committing a theft when he assaulted Cash and therefore his guilty plea to first-degree robbery is invalid.

■ In asserting that he did not specifically admit to each element of the

---

**42.** Ky., 801 S.W.2d 665, 668 (1991).

**43.** *Bell v. Commonwealth*, Ky.App., 473 S.W.2d 820, 821 (1971).

**44.** KRS 515.020.

charges, we believe that Appellant is essentially challenging the sufficiency of the evidence against him. It is well-settled law in Kentucky that a voluntary, intelligent plea of guilty precludes a post-judgment challenge to the sufficiency of the evidence.[45] Therefore, the relevant inquiry becomes whether Appellant's guilty plea was voluntary and intelligent. Appellant argues that his guilty plea was not voluntary because the record reflects that he entered the plea with an apparent lack of understanding of the charges. To support this contention, Appellant points to his own statements during the plea colloquy. While explaining the crimes to the trial court, Appellant repeatedly impressed that he did not pre-plan Cash's murder, that he did not kill Cash in order to effectuate an escape plan, and that he did not decide to take Cash's wallet until after he assaulted Cash.[46] Appellant argues that these statements evidence that he did not fully understand the charges against him, and therefore the trial court erred in concluding that the guilty plea was voluntary and intelligent.

A trial court may not accept a plea of guilty without an affirmative showing that the plea is entered intelligently and voluntarily.[47] The trial court must be satisfied that the defendant has a full understanding of what the guilty plea connotes and its consequences.[48] In reviewing the validity of a guilty plea, an appellate court must examine the totality of the circumstances and determine whether an intelligent plea was entered voluntarily and with understanding of the charges.[49]

After a thorough review of the record, we are not persuaded that Appellant lacked a full understanding of the charges against him. Appellant signed a motion to enter a guilty plea in this matter, as well as a statement waiving his rights as a criminal defendant. Appellant stated to the trial court that he freely signed and fully understood both documents. In addition to a discussion concerning Appellant's

---

45. *Taylor v. Commonwealth*, Ky.App., 724 S.W.2d 223, 225 (1986). *See also Menna v. New York*, 423 U.S. 61 n. 2, 96 S.Ct. 241 n. 2, 46 L.Ed.2d 195 n. 2 (1975) ("[a] counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent it quite validly removes the issue of factual guilt from the case").

46. When asked to explain the crimes, Appellant made the following statements: "I know that there are those that believe that I done this for the purpose of escaping and there are those that will always believe that ... I had less than three and a half years to the Parole Board and for me to do that intentionally, I just had to want to throw my life completely away ... I had nothing planned. If I had anything planned or it was done intentionally with the amount of hours that I had after the thing happened, I probably would not have gotten caught at that particular time. But I made some bad decisions and I done things that, you know, that it is just simply ridiculous to say that it was planned."

The trial court asked Appellant what he did after striking Mr. Cash with the hammer, to which Appellant replied: "I realized ... what had happened and the escape and the robbery came afterwards. Yes, I did go in his pockets, I would assume, and got his wallet, me thinking that he may have had some money on him or something like this, but I just basically got into the truck and left .... But I can tell you, that did not happen because I wanted to escape."

47. RCr 8.08; *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274, 279 (1969).

48. *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir.1975).

49. *Kotas v. Commonwealth*, Ky., 565 S.W.2d 445, 447 (1978), *citing Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

waiver of rights form, which alone would satisfy the requirements of *Boykin*,[50] the trial court engaged in an extensive colloquy with Appellant. Appellant again was reminded of his rights as a criminal defendant and in particular the rights specified in *Boykin*, he was apprised of the nature of the charges against him, he was made aware of the penalties which he faced and the aggravators that would be applied against him, and he was questioned as to whether he was satisfied with his legal representation. Moreover, he was given the opportunity to explain, in his own words, the crimes to which he pled guilty. In response to the trial court's questions, Appellant made numerous declarations of guilt before the trial court; this Court has recognized that solemn declarations in open court carry a strong presumption of veracity.[51] In reviewing the totality of the circumstances, we also bear in mind the lengthy procedural history of this matter: we find it difficult to believe that Appellant lacked an understanding of the charges against him when he had already endured an entire trial and appeal on the same three charges. In light of the foregoing, and with particular regard being paid to the thorough and lengthy plea colloquy conducted by the trial court, we conclude that Appellant entered his guilty plea knowingly and voluntarily. Therefore, Appellant may not now challenge the sufficiency of the evidence against him. Accordingly, Appellant's due process rights have not been violated.

*Failure to Offer Opportunity to Withdraw Guilty Plea*

Appellant next claims that he should have been afforded an opportunity to withdraw his guilty plea once it was determined that a jury would fix his punishment. Appellant entered his unconditional plea of guilty pursuant to RCr 8.08 at a hearing held on January 12, 1995. At the same hearing, but before the plea was accepted, the trial court considered a motion in which the Commonwealth sought to demand the empanelment of a jury for the sentencing phase pursuant to RCr 9.26, despite the fact that Appellant had validly waived his right to jury sentencing. The trial court denied the motion, and the Commonwealth stated its intent to appeal that decision. Understanding that this Court would soon determine the issue conclusively, the trial court agreed to postpone sentencing Appellant until a decision in *Commonwealth v. Johnson* [52] was rendered. Thereafter, the Court of Appeals considered the Commonwealth's appeal in this matter and remanded for jury sentencing in light of *Johnson*.

Appellant now argues that the trial court should have offered him an opportunity to withdraw his guilty plea before the jury-sentencing phase commenced. What is conspicuously and inexplicably absent, however, is a defense motion to withdraw the guilty plea. Appellant acknowledges that the lack of a motion to withdraw renders this issue unpreserved, but nonetheless asks us to review the trial court's failure to re-question him as to his guilty plea for palpable error.

■ The Appellant's arguments are without merit. Absent a defense motion, a trial court is not required to *sua sponte* offer defendants an opportunity to withdraw guilty pleas. The fact that the applicable law concerning jury sentencing in

---

**50.** *Commonwealth v. Crawford,* Ky., 789 S.W.2d 779, 780 (1990).

**51.** *Centers,* 799 S.W.2d at 54.

**52.** Ky., 910 S.W.2d 229 (1995) (holding that RCr 9.84 requires a jury verdict on sentencing in capital cases absent an agreement of all parties).

capital cases shifted during the pendency of this case in no way creates a duty in the trial court to re-question Appellant about his plea. Therefore, we conclude that no reversible error occurred.

## Challenges Concerning Statutory Aggravators

Appellant makes several claims of error with respect to the use of aggravating circumstances during the penalty phase proceedings. Specifically, Appellant alleges that: (1) the trial court erred in permitting the Commonwealth to use heinousness as an aggravator; (2) that Appellant's prior capital conviction was improperly used as an aggravator; and (3) that the trial court erred in failing to direct a verdict for failure to prove all elements of the aggravators.

### Heinousness as an Aggravator

■ Appellant first claims that his Eighth Amendment rights were violated when the Commonwealth urged the jury to impose the death penalty based on the heinousness of the crime. This issue is unpreserved for appellate review, and therefore we will consider the matter under the test set forth in *Sanders.*[53] Appellant contends that the Commonwealth emphasized the heinousness of the crime to such a degree that it essentially asked the jury to base a sentence of death on the heinousness of the crime. Appellant bases this argument solely on the Commonwealth's Attorney's use of the word "heinous" four times in its opening statement.

■ We have reviewed the Commonwealth's Attorney's opening statement and find no error. During his opening, the Commonwealth's Attorney stated to the jury: "The crimes are heinous and the Commonwealth seeks a punishment that befits the nature of these heinous acts." Later in opening statement, the Commonwealth's Attorney twice referred to Appellant's actions as "heinous." Attorneys are afforded much leeway in making opening statements and closing arguments.[54] It must also be remembered that attorneys are presenting arguments to the jury, not evidence. We do not agree that the Commonwealth exceeded its boundaries in referring to Appellant's crimes as "heinous."

■ Furthermore, we do not believe that the Commonwealth's Attorney's use of the word "heinous" to describe the crimes elevated "heinousness" to the level of an aggravating circumstance. The Commonwealth's Attorney enumerated for the jury three statutory aggravators under KRS 532.025(2)(a) that were being applied in this case; heinousness was not among them. The trial court instructed the jury only on those three statutory aggravators. While Appellant is correct in stating that the use of heinousness as an aggravator would be unconstitutional,[55] there is simply no evidence whatsoever that heinousness was used in this case as an aggravating factor.

### Prior Conviction as an Aggravator

Error is next cited where the trial court allowed the admission of Appellant's 1974 willful murder conviction as an aggravator because it was not a capital conviction as required by KRS 532.025(2)(a)(1). Appellant challenges the trial court's ruling on two grounds: (1) that his 1974 conviction was not a capital conviction as required by KRS 532.025(2)(a)(1), and (2) that the ab-

53. *Id.*

54. *Wager v. Commonwealth,* Ky., 751 S.W.2d 28, 30 (1988); *Lynem v. Commonwealth,* Ky., 565 S.W.2d 141, 145 (1978).

55. *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

sence of a record in the 1974 willful murder case left Appellant with no way to be heard in a challenge to the validity of the prior conviction.

▆ Appellant was convicted in 1974 of willful murder. He argues that the conviction was not a capital conviction as required by KRS 532.025(2)(a)(1) because, at the time of sentencing, a federal moratorium against the death penalty was in place, as a result of the U.S. Supreme Court holding in *Furman v. Georgia*.[56] Hence, according to Appellant, the conviction was not a capital conviction because the death penalty was not an option at that time. We can dispense with this argument without determining whether a murder conviction obtained during the federal moratorium against the death penalty is nonetheless a capital conviction for purposes of KRS 532.025(2)(a)(1). "A statutory aggravating circumstance serves to place the appellant in the class eligible for the death penalty."[57] Appellant was already eligible for the death penalty.[58] Thus, we need not decide whether the 1974 willful murder conviction was a "capital" conviction for purposes of KRS 532.025(2)(a)(1). Furthermore, we find no merit to Appellant's assertion that this issue renders KRS 535.010 and KRS 532.025(2)(a)(1) unconstitutionally vague.

▆ Appellant also challenges the use of his 1974 conviction as an aggravator on the grounds that no record of that trial exists. Appellant argues that he was never afforded an effective appeal due to the absence of a trial record, rendering the conviction constitutionally infirm, and

therefore improperly admitted as an aggravator in the present matter. Of course, as stated above, this argument does not warrant reversal as the jury properly found the presence of another statutory aggravating factor, which alone would authorize imposition of the death penalty. However, we will briefly address Appellant's statement in his brief that this Court "affirmed the 1974 conviction, despite the absence of any record," in violation of Section 115 of the Kentucky Constitution, which entitles all criminal defendants to one appeal "upon the record." To state that Appellant was never afforded the opportunity of an effective appeal is materially misleading and hints at serious impropriety on the part of this Court. In an unpublished opinion rendered in May of 1994, this Court unanimously voted to affirm Appellant's 1974 willful murder conviction.[59] While noting the unusual procedural circumstances of the case due to apparent limitations of the record, this Court, after careful consideration as evidenced by the lengthy review of the procedural and factual history of the case, determined that "the record on appeal in this case as approved and settled by the Pike Circuit Court pursuant to CR 75.13, is sufficient to provide for effective appellate review of the proceedings in the trial court leading to the appellant's conviction of the crime of willful murder and his sentence to life imprisonment."[60] Appellant was convicted by a jury and enjoyed effective appellate review; thus, the introduction of this conviction as a statutory aggravating factor was not improper.

**56.** 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

**57.** *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932, 935 (1986). *See also Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982).

**58.** KRS 532.025(2)(a)(5).

**59.** *Thompson v. Commonwealth,* Ky., 86–SC–566–TG (1994).

**60.** *Id.* at 10.

*Directed Verdict*

 Appellant next claims that the trial court erroneously denied his motion for a directed verdict because the Commonwealth failed to prove all elements of the aggravators applied. The appropriate standard for determining whether a trial court should grant a motion for a directed verdict is whether, drawing all fair and reasonable inferences in favor of the Commonwealth, the evidence was sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty; if so, a directed verdict should be denied.[61] The trial court denied Appellant's motion, explaining that the Commonwealth had offered proof of the aggravators. We agree. The jury found two aggravators beyond a reasonable doubt in this case, and substantial evidence was offered to prove each. The Commonwealth called the clerk of the Pike Circuit Court to testify regarding Appellant's prior murder conviction; the Commonwealth likewise proved that Appellant was incarcerated and that Mr. Cash was a prison employee at the time of the murder. The trial court did not err in denying Appellant's motion for a directed verdict.

**Jury Sentencing Over Defense Objection**

Appellant argues that the trial court erroneously allowed jury sentencing over defense objection. In actuality, Appellant is challenging this Court's decision in *Commonwealth v. Johnson,* and asks us to reverse that decision.[62] We decline to do so. *Johnson* requires a jury verdict on sentencing in capital cases except upon the agreement of all parties.[63] In this case, the Commonwealth never agreed to waive jury sentencing. Therefore, the trial court

properly denied Appellant's motion in opposition of jury sentencing.

**Hearing Concerning Effect of *Woodall* Case**

Appellant next claims the trial court erred in denying a motion by which he requested a hearing to consider the effect a trial in a nearby county might have on his sentencing proceedings. Appellant alleges that the capital murder trial of Robert Keith Woodall, which began shortly after Appellant's penalty phase proceedings, was so sensational and shocking that the trial court should have conducted a hearing to determine if that matter would affect Appellant's sentencing trial. We find no merit to this argument. The motion presented to the trial court did not allege that Appellant would be prejudiced by the Woodall trial in some way; rather, it discussed the conflicts that existed because defense counsel was assigned to both trials. The motion was denied, and we conclude that the trial court did not abuse its discretion in doing so.

**Claims of Prosecutorial Misconduct**

 Appellant claims that he was denied a fair trial due to improper comments made by the Commonwealth's Attorney during opening and closing statements. He directs this Court's attention to six separate instances of alleged misconduct during either opening or closing statements. In reviewing allegations of prosecutorial misconduct, "the relevant inquiry on appeal should always center around the overall fairness of the trial, not the culpability of the prosecutor."[64] Particularly, in reviewing opening and closing statements for prosecutorial misconduct,

---

61. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 188 (1991).

62. Ky., 910 S.W.2d 229 (1995).

63. *Id.* at 231.

64. *Maxie v. Commonwealth,* Ky., 82 S.W.3d 860, 866 (2002).

the arguments must be considered as a whole.[65]

Appellant's first claim of prosecutorial misconduct is that the Commonwealth's Attorney improperly used the terms "heinous" and "vicious" to describe the crimes and Appellant, essentially imploring the jury to consider the heinous nature of the crimes as an aggravating circumstance. Appellant is simply rehashing an argument previously raised in this appeal and addressed, *supra*. We find no error.

Appellant next claims that the prosecuting attorney made comments that created the impression that the prosecution was acting on behalf of the victim rather than the Commonwealth.[66] Of course, a Commonwealth's Attorney is just that—a representative of the Commonwealth, not the victim, and it is improper for the Commonwealth's Attorney to suggest otherwise. Nonetheless, while perhaps approaching the line of impropriety, we conclude that these statements fall within the wide latitude afforded attorneys in presenting closing arguments.[67]

Appellant cites error where the Commonwealth's Attorney made statements improperly urging the jury to sentence based on sympathy for the victim, which also served to glorify and enlarge the victim.[68] While the victim may be described to the jury, the victim may not be glorified or enlarged.[69] Reading the prosecution's closing argument as a whole, we conclude that Mr. Cash was not improperly glorified or enlarged in the minds of the jury. Appellant's other claims with respect to this portion of the Commonwealth's closing argument are equally without merit.

Appellant's next claim of prosecutorial misconduct is that the Commonwealth's Attorney improperly suggested that he had "done [his] part" ' in prosecuting Appellant and that the jury was the "final link." [70] We do not agree that the

---

**65.** *Young v. Commonwealth*, Ky., 25 S.W.3d 66, 74–75 (2000).

**66.** During closing argument, the Commonwealth's Attorney stated: "[T]here's also a burden that is being borne today and that is as a Commonwealth Attorney representing a person who is not here today—an empty chair—Charles Fred Cash taken from us by this man—this killer. That is a burden that is very very heavy. As a representative of the Commonwealth to speak on behalf of one that has been murdered. I am the last one on this earth to speak on behalf of Mr. Cash."

**67.** *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175, 178 (1993), *cert. denied*, 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994).

**68.** During his closing, the prosecutor argued the following: "You are here today to impose a punishment and that punishment is death because life has not deterred this defendant.... Charles Fred Cash is serving an eternal sentence because of this man. Why should this defendant's fate be any different than Mr. Cash's? Death brought us to this place.... Justice dictates a finding and a fix-ing of punishment of death. They will ask for mercy. When they ask for mercy, I want you to remember Fred Cash. When they cry for leniency, remember Fred Cash. That's all any prosecutor can ask."

**69.** *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 302–03 (1997).

**70.** The portion of the Commonwealth's closing argument to which Appellant objects is the following: "Ladies and Gentlemen, I stand before you just as a man. I'm not trying to lay any kind of guilt trip on you whatsoever. I'm not trying to arouse any passion. I didn't create those exhibits. I have tried to introduce the evidence as best I could and this is something that I did not take lightly and I have never done this before—standing before a group of jurors and asking that the ultimate penalty be imposed." Then, later in the argument, the prosecuting attorney concluded: "I carry a note with me and I have carried it every day in this trial. It's from my son. He said, do the best you can, Dad. I've done that. I've done all I can do. I'm going to turn it into your hands but I ask

prosecuting attorney's statements constitute a suggestion that the jury was simply the "last link" in a chain, or that the Commonwealth's comment rendered the death penalty a foregone conclusion. Nor do we agree with Appellant's assertion that the jury's decision-making authority was infringed upon. We find no error.

According to Appellant, the Commonwealth improperly insinuated that Appellant should be sentenced to death for exercising his right to be sentenced before a judge and jury, where the victim was simply murdered senselessly.[71] Again, we find no error in these statements.

Finally, Appellant alleges that the Commonwealth's Attorney improperly vilified him by using the terms "mean," "evil," and "vile" to describe him. Upon review of the entire argument, we do not agree that these comments rise to the level of prohibited vilification or abuse of a defendant.[72] Accordingly, we find no error.

## Jury Instructions

■ Appellant argues that the jury instructions were constitutionally defective. He raises sixteen distinct claims of error with respect to the jury instructions given during the penalty phase proceedings. All but one issue are unpreserved and will be reviewed pursuant to *Sand-*

*ers.*[73] In determining if an error occurred, it is necessary to set forth the appropriate analytical framework to be used in challenges to jury instructions:

> [T]he proper inquiry in such cases is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents a consideration of the constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependant upon a single hypothetical "reasonable" juror who might have interpreted the instruction.[74]

■ Appellant first maintains that, because the jury was informed that its verdict must be unanimous, the jury could have mistakenly believed that it was required to find the existence of mitigating factors unanimously as well, before such factors could be considered in arriving at a verdict. He argues that such an instruc-

---

that when you go back there, you look at those exhibits and you consider all of the evidence and you write those three aggravators down on Verdict Form Number Four and you fix this killer's punishment at death."

71. The Commonwealth's Attorney argued the following during his closing: "William Eugene Thompson has been represented by very able and very competent counsel. He has presented evidence in his own behalf. In short, we have spent a considerable amount of time in this matter. But you know, that is as it should be because that is only just and proper, plus it is the law. William Eugene Thompson has received a fair trial, done according to proper legal procedures.... There

in that early morning hour, Charles Fred Cash, a correctional employee, in the course of performing his duty at the Western Kentucky Farm Center, a complex operated by the Department of Corrections, received no trial. That morning, this Defendant, a convicted killer acted as Fred Cash's judge, acted as his jury and he acted as his executioner."

72. *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 544–45 (1988).

73. Ky., 801 S.W.2d 665, 668 (1991).

74. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329 (1990).

tion permitting non-unanimity should have been given, and that the failure to so instruct the jury rendered its verdict so unreliable as to require reversal. This issue was not preserved; however, no such instruction was required and therefore, no error occurred.[75]

Appellant next claims that the format of the verdict forms could have led the jury to believe that, once an aggravator had been found beyond a reasonable doubt, the only permissible sentence would be death. This argument is wholly without merit. An examination of the jury instructions reveals that the jury was informed it could recommend a sentence other than death even if aggravating factors had been found beyond a reasonable doubt. Instruction Four—Authorized Sentence plainly states: "But even if you have found the aggravating circumstance or circumstances to be true beyond a reasonable doubt, you may still impose any of the four punishments for Murder listed above." Thus, we find no error.[76]

Appellant next raises a similar argument: that the jury should have been instructed that it did not have to recommend death even if it found no mitigating circumstances or even, in the alternative, if the jury found that the aggravating circumstances outweighed the mitigating circumstances. Again, the instructions themselves belie this contention: the jury was instructed "if upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment." The jury was

properly instructed that the finding of aggravating circumstances, even coupled with the absence of any mitigating factors, did not require imposition of the death penalty.[77]

■ Appellant next cites error where the trial court did not instruct the jury on non-statutory mitigating circumstances. The jury was instructed to consider mitigating factors that had been presented in the evidence,

> including those aspects of the defendant's character, background and those facts and circumstances of the particular offense of which he is guilty, to wit: the murder of Charles Fred Cash, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true.

Nothing in the instructions prohibited the jury from considering all evidence of mitigation that was presented, nor was defense counsel prevented from arguing evidence of mitigation. Such a "catch-all" provision in the mitigation instruction has been determined to be adequate, and there is no need to instruct the jury on specific non-statutory mitigators.[78]

Appellant next contends that he was entitled to a directed verdict on mitigating circumstances, because the Commonwealth did not present any evidence to rebut the instructed statutory mitigators or the non-statutory mitigators. Therefore, according to Appellant, the trial court should have directed a verdict and ordered the jury that it *must* consider all of the mitiga-

---

75. *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 37 (1998). ("The instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous.") *See also Kordenbrock v. Scroggy,* 919 F.2d 1091, 1121 (6th Cir.1990).

76. *See Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 888–89 (1996).

77. *Id.* at 889.

78. *Tamme,* 973 S.W.2d at 37.

tion evidence, in lieu of the tendered instruction which stated that the jury need only consider such evidence in mitigation that "you believe to be true." This issue is unpreserved as no motion for a directed verdict was presented to the trial court. Regardless, this claim does not warrant reversal as no error occurred. "There is no evidence that Kentucky law considers it appropriate, and there is no case holding that the United States Constitution requires (or even allows) directed verdicts on mitigating circumstances." [79] In rejecting a claim that a directed verdict should have been granted as to a capital defendant's mitigating circumstance of intoxication, the Sixth Circuit explained why Kentucky's status as a "non-balancing" state with respect to capital sentencing defeats the argument:

> [I]n Kentucky, a jury can refuse to give the death penalty as an act of mercy, even if there are no mitigating circumstances, or it can impose it even in the presence of a mitigating circumstance, so long as the defendant is "death qualified" by the presence of one statutory aggravating factor. Therefore, even a directed verdict on the issue of intoxication would not per se exclude the possibility of the jury recommending the death sentence.[80]

Therefore, we conclude that no error occurred.

Appellant's contention that the instructions failed to state the burden of proof regarding the existence of aggravating circumstances is without merit. The instructions clearly apprised the jury that the existence of any aggravating factor had to be found beyond a reasonable doubt.

Appellant raises ten additional arguments concerning the penalty phase instructions, as enumerated below. Each is essentially a plea to overturn long-established precedent, and we decline to do so. First, Appellant challenges the trial court's failure to inform the jury about parole. However, it would have been clear and reversible error to admit such evidence.[81] Appellant cites error where the jury was not instructed that it should not be influenced by passion or prejudice. No such instruction is required.[82] No error occurred where the jury was not requested to put in writing its findings as to whether each mitigating circumstance did or did not exist, as there is no such requirement.[83] The trial court was not required to define the concept or role of mitigating circumstances to the jury, nor to set forth for the jury the standard of proof required.[84] The trial court also was not under a duty to instruct the jury that it could reject the death penalty based on its sympathy for Appellant.[85] Likewise, a burden of proof instruction regarding the existence of aggravating circumstances and that such factors must outweigh the mitigating factors is not required under Kentucky law where the jury has been otherwise properly instructed to weigh the evidence.[86] An instruction requiring that

79. *McQueen v. Scroggy*, 99 F.3d 1302, 1331 (6th Cir.1996). *See also Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 493 (1999).

80. *Id.* at 1332.

81. *Mills*, 996 S.W.2d at 493, *citing Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 164 (1995).

82. *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 169 (1996).

83. KRS 532.025(3); *Smith v. Commonwealth*, Ky., 734 S.W.2d 437, 451 (1987).

84. *Tamme*, 973 S.W.2d at 37–38.

85. *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

86. *Smith v. Commonwealth*, Ky., 599 S.W.2d 900, 912 (1980). ("So long as we have properly instructed jurors to weigh the evidence in their deliberations, without the court having

the aggravators outweigh the mitigators beyond a reasonable doubt is also not required under Kentucky law.[87] An instruction limiting the jury's consideration to only those aggravating factors enumerated in KRS 532.025 is not required.[88] The allegation that "reasonable doubt" should have been defined for the benefit of the jury is without merit; this Court has consistently held that reasonable doubt need not be defined, in accordance with RCr 9.56(2).[89] No error occurred where the trial court did not inform the jury of the consequences of its sentence, *i.e.* that a death sentence would actually result in electrocution.[90] Appellant's argument regarding an instruction concerning the presumption of innocence is without merit; the jury was instructed that any aggravating factor had to be determined beyond a reasonable doubt. Finally, residual doubt of guilt is not a mitigating circumstance and no error occurred because the jury was not so instructed.[91]

**Sentencing**

Appellant raises three arguments with respect to the trial judge's sentencing. First, Appellant claims that the trial court did not consider non-statutory mitigators. However, Appellant fails to provide any evidence that the trial judge failed to consider evidence of mitigation. In fact, the trial court stated on the record, during the sentencing hearing, that it had considered all of the evidence, arguments, and motions presented. This argument is unfounded.

■ Appellant next cites error where the trial court failed to make specific written findings regarding mitigating circumstances. This argument is also without merit; the trial court is not required to make specific findings of mitigating factors.[92]

Likewise, Appellant's contention that there is no articulated standard of review for the trial court in determining sentence is without merit.[93] The trial court acted within its discretion in upholding the jury's sentencing recommendation.

**Jury Selection Issues**

*Excusal of Five Jurors Based on Attitudes Toward the Death Penalty*

Appellant asserts that the trial court deprived him of a fair and impartial jury by improperly excusing five prospective jurors based on their opposition to the death penalty. The basis of this contention is that the trial court inadequately questioned prospective jurors CM, BC, RD, WH, and JS after they expressed their reservations.

to encroach on their prerogatives, we do not need to instruct the jury on the weight of aggravating and mitigating circumstances.")

87. KRS 532.025; *Bowling,* 942 S.W.2d at 306.

88. *Smith,* 599 S.W.2d at 911. ("The court properly declined to instruct the jury that it could not consider any aggravating factors not enumerated in KRS 532.025(2). Such an instruction would have been improper.")

89. *Id.* at 911. ("Counsel for appellant offered instructions in which 'reasonable doubt' was attempted to be defined; however, the trial court refused to give them, and properly so.")

90. *Bowling,* 942 S.W.2d at 306. ("Such an instruction is not required by law and its omission cannot be considered error. A jury selecting death as a sentence must be presumed to know that death will be the result of that sentence.")

91. *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111, 115 (1994).

92. *Bowling,* 942 S.W.2d at 306.

93. *Id.*

A prospective juror may be excluded for cause because of his or her views on capital punishment if those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[94] The mere expression of reservations or scruples about capital punishment is not enough to determine that person's position "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal."[95] The excusal of jurors for cause is a matter within the sound discretion of the trial court.[96]

In response to questioning by the court, CM stated that she could not put anybody to death because of her religious beliefs. BC stated repeatedly that she did not believe in capital punishment and would not impose it under any circumstances. RD told the court that she would automatically exclude the death penalty from consideration. WH also stated that he did not believe in capital punishment and would not consider it. After hearing the range of possible punishments, JS initially stated that she had a problem with the death penalty because of her religious beliefs, but that circumstances might modify that feeling. She went on to say that neither twenty years' imprisonment nor life imprisonment was enough punishment for murder. She stated that life without the possibility of parole was enough. We are convinced that the prospective jurors unequivocally stated their inability to impose the death penalty under any circumstances. In the case of JS, although she stated that circumstances might affect her opposition to capital punishment, she also stated that she could not consider the minimum sentence either.[97] There was no abuse of discretion.

*Failure to Excuse Jurors for Cause*

Appellant also argues that he was denied a fair and impartial jury by the trial court's failure to excuse six jurors for cause because of their attitudes in favor of the death penalty.

Prospective jurors should be excused for cause if they would automatically impose the death penalty upon a finding of guilt.[98] Jurors must be able to consider the entire range of penalties for intentional murder and cannot favor the death penalty to the exclusion of all other penalties prescribed by law.[99] The test for determining whether a juror should be stricken for cause is "whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict."[100] Agreement and immediate embracement with the law when it is presented in its most abstract or extreme manner is not a prerequisite for

94. *Caudill v. Commonwealth*, Ky., 120 S.W.3d 635, 654 (2003) (*quoting Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

95. *Id.* (*quoting Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)).

96. *Furnish v. Commonwealth*, Ky., 95 S.W.3d 34, 44 (2002), *cert. denied*, 540 U.S. 844, 124 S.Ct. 115, 157 L.Ed.2d 80 (2003).

97. *See Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 137 (1988).

98. *Caudill, supra*, (*citing Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).

99. *Id.* at 655.

100. *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 671 (1994).

qualification.[101] "The fact that some potential jurors expressed a tendency toward the most severe penalty when presented with specific situations does not automatically preclude their service."[102] Again, the determination of this matter is within the sound discretion of the trial court.

In this case, the trial court conducted a thorough individual voir dire. The court informed each juror of the entire range of penalties and the existence of aggravating and mitigating factors. The court inquired as to whether each juror would be able to consider these issues and follow the court's instructions pertaining to them. The court also discerned the extent to which the jurors may have been affected by publicity. Counsel for both the Commonwealth and defense were permitted to ask follow-up questions. There was some confusion among the jurors regarding the use of mitigating evidence, however, the court cleared this up when it explained that mitigating evidence does not go to guilt or innocence, but rather to fixing the severity of punishment. The six jurors at issue were all able to articulate that they could consider the entire range of penalties as well as the evidence of aggravating and mitigating factors in determining punishment. The jurors also expressed that they would be able to follow the instructions of the court in accordance with the law and that neither their attitude nor their judgment was affected by any outside influence. There was no abuse of discretion.

*Refusal to Grant Additional Peremptory Challenges*

Appellant argues that he was denied a fair and impartial jury by the trial court's refusal to grant him additional peremptory challenges.

■ Appellant was granted the amount of peremptory challenges required by RCr 9.40. The decision to grant additional peremptories is within the sound discretion of the trial court.[103] The trial court did not abuse its discretion.

*Morgan claim*

■ Appellant also claims that he was not afforded the opportunity to adequately question jurors about their attitude towards the death penalty in light of the aggravators presented by the Commonwealth. The trial court did ask the prospective jurors whether they could consider the full range of penalties for Appellant where evidence would be presented of three aggravating factors, in addition to evidence of mitigating circumstances. Appellant requested the court to ask the jurors a slightly different question regarding their attitude towards the death penalty: that is, if they would automatically impose the death sentence if the three aggravators were proven beyond a reasonable doubt. The trial court denied defense counsel's request, determining that the proposed question impermissibly asked a prospective juror to commit to a verdict before hearing the evidence. The trial court also noted that it felt that the proposed question was essentially a re-wording of questions already being posed. Appellant claims that the trial court's ruling denied him due process of law because he was not able to intelligently exercise his preemptory challenges and challenges for cause in striking prospective jurors.

■ Appellant's reliance on *Morgan v.*

---

101. *Id.*

102. *Bowling v. Commonwealth,* 873 S.W.2d at 177.

103. *Tamme,* 973 S.W.2d at 26.

*Illinois* is misplaced.[104] In *Morgan*, it was determined that the defendant should have been permitted to inquire whether a prospective juror would automatically impose the death penalty upon conviction; *i.e.*, if the prospective juror would recommend death regardless of any evidence in mitigation, so long as the defendant was proven guilty beyond a reasonable doubt. The question actually posed by the trial court in *Morgan*—that is, whether a prospective juror would "follow the instructions on the law"—was insufficient to satisfy the due process right to make meaningful inquiry into jurors' biases and views towards the death penalty.[105] *Morgan* concerns itself with the defendant's right to make inquiry; it does not set forth an affirmative right to ask certain specific questions of prospective jurors, as Appellant asserts. Where a defendant is seeking to determine prospective jurors' attitudes towards the death penalty, "it would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating." [106]

Here, Appellant's proposed question seeks to determine whether a prospective juror is so biased in favor of the death penalty, that he or she would automatically impose it upon a finding of aggravating circumstances. Essentially, Appellant was seeking to determine whether a prospective juror would consider evidence in mitigation, even where aggravating factors existed. We conclude that the permitted voir dire was sufficient and thorough enough to elicit the information sought by Appellant. After reciting the aggravating circumstances in the case, defense counsel asked the voir dire panel if "those facts that you will find make you believe that maybe there's already an opinion in your mind or in your head about what needs to be done?" Defense counsel was permitted to ask each juror whether he or she could consider all ranges of penalties. The trial court also engaged in questioning concerning jurors' attitudes towards the death penalty, specifically asking jurors whether they would consider all range of penalties in light of the evidence and whether they had already formed an opinion based on the preliminary facts presented (which included a synopsis of the circumstances of the crime and the aggravators to be applied in the case).

The extent of and scope of direct questioning during voir dire examination is a matter within the sound discretion of the trial court.[107] The trial court determined that the information sought by Appellant was already being elicited by other questions, and the record supports this conclusion. We find no abuse of discretion.

*Death Qualification*

Finally, Appellant argues that death qualification of a jury is unconstitutional. This Court and the United States Supreme Court have rejected this argument.[108]

**Double Jeopardy**

Appellant claims that he was exposed to double jeopardy where the parole board ordered a serve-out of his sentence from the 1974 willful murder conviction

104. 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

105. 504 U.S. at 723, 112 S.Ct. at 2226, 119 L.Ed.2d at 499.

106. *McQueen*, 99 F.3d at 1330.

107. *Tamme*, 973 S.W.2d at 25.

108. *Lockhart v. McCree*, 476 U.S. 162, 165, 106 S.Ct. 1758, 1760, 90 L.Ed.2d 137, 142 (1986); *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 672 (1991).

because of the murder of Mr. Cash, and then Appellant was sentenced to death for the same crime. Appellant argues that he is being punished twice for the same crime in violation of his Constitutional rights.

Appellant waived this issue. Defense counsel presented the question of double jeopardy to the trial court, at which time the trial court instructed defense counsel to submit a written memorandum. Defense counsel did not submit a memorandum and the issue was not thereafter considered.

 Regardless, Appellant's contention is without merit. Double jeopardy does not apply to parole or probation revocation proceedings because the threat of a negative parole board finding does not rise to the level of being "put in jeopardy" in the Constitutional sense.[109] In other words, a parole or probation hearing simply is not the equivalent of a criminal prosecution because a conviction could not flow from such a proceeding.[110] Therefore, we conclude that double jeopardy does not bar the Commonwealth from sentencing Appellant to death for the murder of Mr. Cash where that behavior was also used adversely against Appellant at his parole hearing.[111]

**Proportionality Review**

 Pursuant to KRS 532.075, we have reviewed the death sentence imposed here-in. Our review of the record and consideration of counsels' arguments indicates that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor.[112] Rather, the sentence was based on Appellant's own admission of the crimes and the substantial evidence presented in support of two statutory aggravating factors.

Contrary to Appellant's assertion, the evidence of mitigation did not outweigh the evidence of aggravation. While defense counsel did present a significant amount of evidence in mitigation, especially concerning Appellant's background and mental state, the evidence of aggravation was substantial and compelling. The sentencing jury found the existence of two statutory aggravating factors beyond a reasonable doubt, and there was ample evidence to support this finding.[113]

 Our review indicates that this sentence of death is neither excessive nor disproportionate to the penalty imposed in other similar capital cases, considering both the crime and this particular defendant.[114] In conducting a proportionality review, we must consider not only whether other criminal defendants received the death penalty for similar crimes, but also whether Appellant's sentence is dispropor-

**109.** *United States v. Miller*, 797 F.2d 336, 340 (6th Cir.1986) (concluding that double jeopardy did not preclude the Government from prosecuting defendant for illegal activity where it had previously and unsuccessfully attempted to have defendant's probation revoked for the same activity). *See also United States v. Whitney*, 649 F.2d 296, 298 (5th Cir.1981) (noting that "parole and probation revocation proceedings are not designed to punish a criminal defendant for violation of a criminal law . . . [but] to determine whether a parolee or probationer has violated the conditions of his parole or probation").

**110.** *Id.* at 340.

**111.** *Cf. St. Clair v. Roark*, Ky., 10 S.W.3d 482, 487 (2000). ("Nor is it double jeopardy to impose a separate penalty for one offense while using the same offense as an aggravating circumstance authorizing imposition of capital punishment for another offense.")

**112.** KRS 532.075(3)(a).

**113.** KRS 532.075(3)(b).

**114.** KRS 532.075(3)(c).

tionate in relation to *this* crime.[115] We have reviewed those cases since 1970 in which the death penalty was imposed for a single murder and conclude that the punishment herein is not excessive or disproportionate. In particular, we have considered the cases of *Johnson v. Commonwealth*[116] and *Mills v. Commonwealth*,[117] both involving a single murder victim. Nor do we believe that the death sentence is disproportionate with respect to Appellant and the crimes to which he pled guilty. The fact that the victim was an employee of the prison facility, that the victim was beaten repeatedly and viciously to the head with a hammer, then dragged and left to perish in a barn stall, that Appellant thereafter robbed the victim and escaped from the prison facility, and the admitted lack of any cognizable motive are significant to this determination. Therefore, there was no error.

## Constitutionality of Death Penalty

Appellant asks this Court to declare Kentucky's death penalty statute unconstitutional. The constitutionality of the death penalty statute is well settled.[118]

Appellant's assertion that Kentucky's death penalty statute operates in a discriminatory and arbitrary fashion is without merit. Its application cannot be considered arbitrary in light of the guidelines for its imposition set forth in KRS 532.035 and KRS 532.075.[119]

Appellant was not denied effective assistance of counsel, rational sentencing, due process or equal protection of the law where he was denied access to this Court's compilation of KRS 532.075 data.[120]

Kentucky's proportionality review is constitutional and comports with statutory requirements and the federal Constitution.[121] Appellant asserts that KRS 532.075 is unconstitutional because it lacks sufficient articulated standards, thus denying him procedural due process of law; this argument has been presented, considered and rejected by this Court on numerous occasions.[122]

## Cumulative Error

Appellant received a fundamentally fair penalty proceeding and there was insufficient harmless error to create a cumulative effect that would mandate reversal for a new trial.

For all of the foregoing reasons, the judgments and sentences imposed by the Lyon Circuit Court are affirmed.

All concur.

**115.** KRS 532.075; *See also McQueen v. Scroggy*, 99 F.3d 1302 (6th Cir.1996).

**116.** Ky., 103 S.W.3d 687 (2003).

**117.** Ky., 996 S.W.2d 473 (1999).

**118.** *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 682 (1985).

**119.** *Bowling*, 942 S.W.2d at 306. *See also Tamme*, 973 S.W.2d at 40.

**120.** *Harper v. Commonwealth*, Ky., 694 S.W.2d 665, 670–671 (1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).

**121.** *Sanders*, 801 S.W.2d at 683.

**122.** *Id.; See also Foley*, 942 S.W.2d at 890; *Bowling*, 873 S.W.2d at 182.